IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 7, 2020 Session

## SIMA KHAYATT KHOLGHI v. REZA ALIABADI

**Appeal from the Circuit Court for Davidson County**
**No. 16D-1706        Phillip R. Robinson, Judge**
_____

**No. M2019-01793-COA-R3-CV**
_____

This is an appeal from a divorce proceeding.  The parties were married for around thirty years, during which time the husband built a successful business and the wife was a homemaker and stay-at-home mother to the parties' two children.  After five days of trial, the trial court classified, valued, and divided the parties' sizeable marital estate; awarded the wife alimony in futuro; and ordered the husband to pay a portion of the wife's attorney's fees.  Both parties raise various issues on appeal.  For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

Donald Capparella and Kimberly Macdonald, Nashville, Tennessee, for the appellant, Reza Aliabadi (on appeal only).

Helen Sfikas Rogers and Stella V. Kamm, Nashville, Tennessee, for the appellee, Sima Khayatt Kholghi.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

Reza Aliabadi ("Husband") and Sima Khayatt Kholghi ("Wife") both grew up in Iran.  Husband came to the United States in 1978 at the age of 17.  He obtained his GED in Nashville and attended college for about a year before he and his father started a rug

business in 1981 called Marketing and Sales Management Corporation d/b/a MSM Industries ("MSM"). In addition to selling rugs, MSM imported and sold nonslip rug pads.

Wife moved to the United States in 1983 at the age of 19. She attended high school in Denver, Colorado, for one semester and took classes in English as a second language because she could only understand very basic conversational English. She obtained a high school diploma and took classes at a community college, but the classes were too difficult for her. Wife lived with her parents, who had their own rug store in Denver, and she occasionally helped them at the store without pay.

Wife's family began conducting business with MSM, and in 1988, Wife met Husband while he was selling rug pads. In November 1988, the parties had a religious marriage ceremony in Nashville. On February 14, 1989, they had a legal marriage ceremony at the courthouse.

Around the time of the marriage, MSM began manufacturing its own nonslip rug pads utilizing custom-made machinery. Husband and his father had purchased five acres of land in Smyrna, Tennessee, and constructed a manufacturing plant. Husband and his father also continued to operate their rug store. Wife occasionally worked at the store, answering the telephone, taking orders for rug pads, and interacting with customers. She also traveled to trade shows with Husband. However, Husband never paid Wife a salary or wages for her work.

In 1993, Wife gave birth to a daughter and stopped working at the store. In 1997, the parties had a son. Wife was a homemaker and stay-at-home mother for the remainder of the marriage. Husband's business continued to grow, which required him to travel frequently, especially to China. In 2002, Husband and his father bought an adjacent commercial property in Smyrna, for a total of twelve acres. Their business struggled financially in 2008 during the economic downturn, and Husband borrowed large sums of money from members of Wife's family in Denver. Husband and his father closed their rug store around that time. Eventually, however, MSM became very successful at manufacturing not only rug pads but other nonslip products, including yoga mats, shelf liners, grocery case liners, and toolbox liners. MSM had around eighty employees. At the time, MSM had two employees who lived out-of-state but traveled to Smyrna on a regular basis. In order to avoid their frequent hotel bills, Husband and his father purchased a four-bedroom home in Nashville, at 500 Cinnamon Place, and rented it to MSM for the use of the two out-of-state employees.

Husband handled all of the parties' financial matters. The parties built a home in Nashville with over 12,000 square feet and valued at over $2 million. They had a housekeeper, luxury vehicles, and enjoyed traveling. Both children attained the age of majority during the marriage. Toward the end of the marriage, Wife accused Husband of adultery. She saw hotel reservations for two guests on Husband's phone and a suspicious

text message from a woman thanking Husband for giving her so much money. Wife eventually filed a complaint for divorce on September 8, 2016.[1] She asked the court to grant her a divorce, equitably divide the parties' marital estate, and award her alimony and attorney's fees. Husband filed an answer and counter-complaint for divorce.

On May 22, 2017, Wife filed a motion for pendente lite support. Wife asserted that Husband had recently moved out of the marital residence, and although he continued to pay the basic customary household expenses for the home, he had informed Wife that she was limited to only $2,000 per month from their joint bank account. In addition, Husband had replaced Wife's credit card, which previously had a spending limit of $30,800, and given her a new card with a spending limit of $3,500 per month. At the same time, Wife alleged, Husband allowed the parties' grown children to retain their cards and make charges to the parties' credit card account. Wife asserted that Husband was spending nearly $5,000 per month on the parties' grown children. She attached Husband's deposition testimony and his current income and expense statement, which reflected expenses of $33,888.54 per month. This included $1,944 for their daughter's apartment, $685 for their son's apartment, $683 for their daughter's car payment, and $323 for their son's car payment, in addition to other expenses for them. Husband was also investing $4,000 per month into investment accounts for the grown children, and both accounts had balances exceeding $40,000. Husband conceded during his deposition that there was no reason why the children could not use those account balances to pay for their own expenses, adding, "I'm just a dad taking care of it."

Additionally, Wife alleged that Husband had moved out of the marital residence and into a Brentwood apartment where he was paying $3,000 per month in rent. She suggested that Husband could have moved into the home on Cinnamon Place, which was a four-bedroom home currently being used only periodically by one out-of-town employee of MSM. Wife also complained that Husband had just purchased a 2016 Porsche Panamera for himself, and he was spending around $2,000 per month on that payment alone while limiting her to only $2,000 from their joint checking account. Wife asserted that Husband was the president and CEO of "a multinational company" grossing approximately $10 million per year, while she was a homemaker with no other income. Wife submitted an income and expense statement listing $14,483 for her monthly expenses, including a housekeeper and personal chef. She requested an award of pendente lite support in the sum of $10,000 per month to enable her to pay for her customary standard of living, attorney's fees, and expenses for repairs to the marital home in anticipation of listing it for sale.

Husband filed a response in opposition to the motion for pendente lite support,

---

[1] Upon the filing and service of the complaint for divorce, a temporary injunction went into effect "restraining and enjoining both parties from transferring, assigning, borrowing against, concealing or in any way dissipating or disposing, without the consent of the other party or an order of the court, of any marital property." Tenn. Code Ann. § 36-4-106(d)(1).

arguing that Wife's request was unreasonable and excessive. He maintained that $2,000 per month in funds and $3,500 per month in credit card access was sufficient in light of the fact that he continued to pay the bills associated with the marital residence. Husband claimed that he canceled Wife's credit card because she charged attorney's fees to the account and exceeded the credit limit by over $12,000. He acknowledged paying $2,000 per month for the new Porsche payment but noted that he was also paying $1,350 per month for Wife's Audi lease. He claimed that his decision to rent an apartment for $3,000 was justified because he wanted to be near his parents' residence in light of their advanced age and the fact that he picked up his 85-year-old father in the mornings before commuting to work. Husband claimed that his apartment was only 2.8 miles away from his parents' residence and that the Cinnamon Place home was 9 miles away. He agreed to pay contractors directly for repairs to the marital home but insisted that Wife did not need any additional pendente lite support. Husband asked the court to order the sale of the marital home to pay the parties' attorney's fees. He claimed that "a large portion" of the income reflected on his tax returns went to pay the mortgage on his commercial property and that he did not actually receive that income.

The trial court held a hearing on the motion for pendente lite support on June 9, 2017. The record before us only contains a transcript of the trial court's oral ruling at the end of the hearing. At the outset, the trial judge admonished both parties regarding their excessive spending, explaining that they could no longer do as they wished now that the divorce action was pending. The trial judge explained that he frowned upon "husbands running off the deep end and spending and wasting money" but also divorcing wives "going on spending sprees" and expecting their husbands to pay for it. The trial judge deemed some of the expenses on Wife's income and expense statement "outrageous." As for Husband, the trial judge said he did not know of any reason why Husband could not reside in the Cinnamon Place home rather than renting an apartment for $3,000 per month. The trial judge stated that Husband would have the option of moving into the house he jointly owned with his father, and if he did not, "as far as I'm concerned, that's a dissipation every month, and the Court will deal with that at the final hearing." As for the Porsche, the trial judge remarked, "It's hard for me to get too upset about $2,000 for a Porsche when the wife is spending certainly less but a substantial amount for her vehicle." However, the trial judge cautioned Husband that he was "not a fan of supporting adult children beyond what you're supporting your spouse." The trial judge said he expected Husband's charges for the parties' grown children to "be more reasonable." He added, "this Court is not going to approve $7,000 a month for your children to charge on credit cards." The trial judge said he was not going to impose a specific limit on what Husband could spend on the children, but, he added, "if it continues this high, the court is going to consider that a dissipation also."

Ultimately, the trial judge ordered Husband to provide Wife with a credit card with a limit of $15,000, but the judge directed Wife to spend no more than $7,000 per month except in the case of an emergency. He eliminated Wife's $2,000 per month withdrawal

from the joint checking account. Husband was ordered to continue paying the mortgage and utilities for the marital residence in addition to all insurance. Wife was required to pay for other household expenses such as yard maintenance, pest control, security system, housekeeper, etc. The trial judge declined to order Husband to pay Wife's attorney's fees because he had been paying them voluntarily, but he directed Wife to file a motion if it became an issue.

Thereafter, Wife filed an affidavit of the parties' realtor, who described numerous repairs that needed to be made before the marital residence could be listed for sale. The realtor stated that the home was "in such disrepair" that it was "not marketable in its present state." Husband opposed making the repairs and suggested listing the property "as is," claiming that his company did not have enough "cash flow" to support spending $100,000 on home repairs. He submitted an affidavit from MSM's vice president of finance, Mark Noel, who conceded that "the company grosses over $10 million per year" but said that other factors should be taken into account "when evaluating [Husband's] financial liquidity." He explained that MSM was currently importing large quantities of inventory in advance from China in order to improve its profit margins, and it did not currently have sufficient cash flow to allow Husband to withdraw $100,000 from the company.[2] After a hearing, the trial court directed the parties' realtor to prioritize which repairs from the home inspection report were most needed. The court would then determine the repairs to be completed and require Husband to pay for the ordered repairs, but he would be repaid "off the top" after the sale of the house.

Husband subsequently filed a motion seeking permission to obtain a home equity line of credit ("HELOC") to pay for the repairs to the marital residence. Wife opposed the motion on the basis that a HELOC would needlessly dissipate the marital assets. She claimed that Husband was using "accounting gymnastics" to make it appear as if his business was not profitable and he lacked access to cash. Wife also claimed that Husband had stopped paying for her attorney's fees, claiming an inability to pay, while spending $3,000 per month on his apartment and thousands of dollars in expenses for their grown children. After another hearing, the trial court entered an order allowing Husband to obtain a HELOC to pay for the repairs to the marital home. The court also ruled that Husband would pay Wife's pendente lite support payments by direct deposit of $7,000 to her bank account rather than utilizing the credit card.

The divorce trial was held over the course of four days in January 2019. A great deal of the testimony centered on the valuation of MSM and Husband's income. Each party presented expert testimony of a certified public accountant as to these issues. Determining Husband's income was no easy task. According to Tom Price, Wife's expert

---

[2] Testimony at trial established that MSM had increased its inventory at the business in the last couple of years in part because it had partnered with Amazon and had to maintain a sufficient supply of inventory to be able to meet two-day shipping requirements.

witness, both Husband and his father had historically taken what they designated as "shareholder loans" from MSM every month in addition to traditional compensation. He explained that Husband and his father typically used the company credit cards for both personal and business expenses. When the bill arrived each month, they would simply tell the company's accountant which expenses they deemed "personal" or "business." The designated "business" expenses would be expensed through the business. The "personal" expenses would also be paid by MSM but would be recorded as a "loan" to each shareholder. Mr. Price testified that these so-called shareholder loans had been carried on the company books for years. However, there was no loan document reflecting any loan terms, no collateral, and no interest owed or paid. According to the company's records, MSM paid Husband traditional W-2 compensation of around $215,000 per year. However, each month Husband would void his paycheck, and the amount of the voided paycheck would then be credited as a payment toward his shareholder loans. In August 2016, the month before the complaint for divorce was filed on September 8, MSM records showed that Husband owed $592,285.96 in shareholder loans. By November 2018, just before trial, his shareholder loan balance had increased to $1,781,624.46, the largest balance in the history of the company. Thus, in addition to his traditional compensation, Husband had drawn $614,985.70 in personal shareholder loans from the company in 2016 and $449,420.17 in shareholder loans from the company in 2017. In 2018, Husband's shareholder loan balance increased by another $383,000. Husband's "personal" charges making up the shareholder loans included some items that benefitted Wife, such as payment of the mortgage for the marital home and the parties' attorney's fees. However, other expenditures did not benefit Wife, such as Husband's apartment rent and related bills, a portion of the payment for his Porsche, and expenses for his grown children.

No one could really explain why Husband and his father chose to characterize their spending as "shareholder loans" rather than additional traditional compensation. The company's vice president of finance, Mr. Noel, testified that the practice of taking these "advances" began before he was employed at the company and that the loan balance had never been repaid to zero during his twelve years of employment. He opined that, as owners, Husband and his father could take money out of the company as they saw fit. Mr. Noel acknowledged that he did not know of any reason why the shareholders would not have simply increased their salary and said he thought "it could have been done either way." Wife's expert, Mr. Price, suggested that the shareholders might be characterizing the payments as loans rather than income to avoid the Medicare tax of 2.9% and the six percent "Hall tax" imposed by the State of Tennessee on corporate distributions.[3] When Mr. Price valued the business, he reclassified the so-called shareholder loans as shareholder equity distributions (income or cash flow to Husband) because they had been carried on the books for years, they were not repaid to zero, there was no loan document or interest paid, and he did not believe the loans would have been repaid anytime in the near future. Mr. Price also noted that one of MSM's own documents referred to the shareholder loans

---

[3] MSM operated as a subchapter S corporation.

as "Owner Equity Distributions." Husband's expert, Vic Alexander, considered the shareholder loans to be valid obligations but conceded that he would not recommend the practice of making a loan of $1.7 million with no collateral. When Husband was asked during his deposition why he borrowed from the company rather than taking out additional compensation, he replied, "I guess taxes and -- I have no idea. I don't think it makes any difference at the end of the year." Wife testified that she had signed the parties' joint tax returns over the years but was unaware that Husband was supposedly borrowing money from MSM rather than earning it as income.

Aside from the issue of shareholder loans, Husband also received rental income from MSM due to his one-half ownership of the 12-acre commercial property and manufacturing plant in Smyrna and the Cinnamon Place home in Nashville. In 2017, Husband received $317,400 in annual rental income for the Smyrna property and $21,600 in annual rental income for the Cinnamon Place property. At the time of trial, Husband was receiving around $32,000 per month in rent from MSM for the Smyrna property, but he used approximately $30,000 of that sum to pay the sizeable mortgage payment on the property. He was receiving $1800 per month in rental income for the unencumbered Cinnamon Place property.

Wife's expert and Husband's expert agreed that Husband's tax returns for the past three years reflected an average pre-tax pre-interest "cash flow," or gross revenue, of $643,259 per year, which included his traditional compensation and rental income but not any shareholder loans. The experts also acknowledged that the numbers reflected on the most recent tax returns for MSM and the parties were somewhat skewed because of large atypical write-offs taken by MSM during the divorce proceeding. Specifically, in 2016 and 2017, MSM decided to take large deductions for a bad debt of $641,000 from the rug store that had closed ten years earlier and $410,000 in connection with the rug store's old inventory.[4] The bad debt write-off also impacted Husband's personal return. Putting the nonrecurring write-off aside, Wife's expert conceded that the "more accurate" annual cash flow average for Husband was $536,356. Husband's post-divorce income and expense statement listed $46,000 per month in "net income" from MSM, which included his monthly salary and rental income but not shareholder loans. It listed $54,950 in monthly

---

[4] The trial court would eventually find "the timing of the write-off suspect in light of the failure of the company to take such write-offs in the past." The court explained:

> The Court finds that while it is not unusual for a company to write off obsolete inventory, there is no evidence that MSM has ever written off obsolete inventory in the history of this company. . . . The effect of this adjustment resulted in a gross profit percentage which was significantly less than in recent years.

The court found that MSM showed a loss for 2017 "due to the $410,000 write off," when it would have had positive earnings without the write-off. Thus, the court found that consideration of the write-off "unfairly skews the value of the company" and "skews the valuation of the parties' share of the business which the Court finds to be unreasonable and unjust under the circumstances."

expenses, for a monthly deficit of $8,950.

Husband was 59 years old at the time of trial and in good health. He and Wife had been legally married for nearly thirty years. He attempted to explain the suspicious text message and denied making hotel reservations for himself and another adult, claiming that the booking application he used set two guests by default. The reservations showing two adults were for hotels not only in China but also in San Diego, Seattle, Chicago, and Germantown, Tennessee.

Husband testified that after Wife filed for divorce, he moved out of the master bedroom and into another bedroom in their 12,000-square-foot home. He testified that he decided to move out after an argument escalated between him and Wife. Husband testified that the four-bedroom Cinnamon Place house was being used by MSM for an engineer from New York who traveled to Nashville two weeks per month. He testified that because he treated the Cinnamon Place house as a rental property on his own tax returns and the rent as a business expense on MSM's returns, he could not live in it for more than fourteen days without impacting the way it was classified for tax purposes. The Cinnamon Place property had recently been appraised for $360,000.

The commercial property and manufacturing plant in Smyrna had recently been appraised for $9.9 million. Husband contended that some if not all of the commercial property and the business value should be classified as his separate property because he owned them prior to the marriage. In the event that a portion of the business was deemed marital, Husband proposed valuing the "marital portion" of his one-half interest in MSM at approximately one million dollars, but he pointed out that he owed the company about $1.7 million in shareholder loans. Thus, on his proposed division of property, he valued his one-half interest in the business as a *negative* number and reflected it only as a *debt* of $565,788 owed to MSM and to be assigned to Husband.

Husband testified that in the event of his father's death, his father's interest in MSM would go into a trust for the benefit of Husband's mother during her lifetime. Husband was an only child and testified that he would become the beneficiary of the trust at his mother's death. He also testified that he and his father had a buy-sell agreement that would govern what happened in the event of death. Husband's father was 87 years old, and his mother was 82.

Husband conceded that he had stopped paying for his and Wife's attorney's fees roughly a year before trial but insisted that he did not have the funds to do so. Husband testified that he borrowed money from his father during the divorce proceeding to pay the parties' personal income tax obligation of approximately $70,000 and to purchase Wife's Audi at the end of its lease for around $40,000. He also maintained that he did not have the money to pay for the repairs to the marital home and so it was necessary for him to utilize the HELOC, which had a balance of $130,000 at the time of trial. Husband and his

father also took out an additional $200,000 loan against the Smyrna property during the divorce proceeding.

Despite his claimed inability to pay the aforementioned expenses, Husband testified that he deemed it appropriate to purchase his Porsche for approximately $100,000 because he thought it helped his business image. His monthly car payment was roughly $2,000. His apartment rent had increased to $3,200 per month. Husband also acknowledged that he had continued to pay his adult children's expenses through the business as shareholder loans. The parties' daughter was twenty-five years old, living in an apartment in Atlanta, and employed full-time throughout the divorce proceeding. She was a college graduate, and Husband and Wife had paid for her college education. The parties' son was twenty-one years old and living in Denver, working for Wife's family in their business. Husband testified that after the trial judge admonished him not to spend so much on the parties' children at the pendente lite hearing, his father began paying for the children's expenses and charging it against his own shareholder loans from MSM. Husband acknowledged that "[n]ow it's just charged to [his] father's account instead of [his] account."

Husband did not dispute Wife's calculation that he paid around $47,000 in credit card charges by his son and daughter just while the divorce was pending. Husband also contributed $4,000 per month to UTMA investment accounts for their grown children through 2017.[5] According to Wife's calculation, Husband deposited $40,000 in the children's investment accounts during the divorce proceeding without her knowledge or consent. By the time of trial, the children's accounts each had a balance of approximately $70,000. Husband also acknowledged making deposits to another account for Son during the divorce proceeding.

Husband testified that he believed Wife was capable of working full-time. He opposed her request for alimony in futuro and suggested that she should be limited to transitional or rehabilitative alimony. Regarding her ability to work, Wife presented the testimony of Linda Jones, a certified rehabilitation counselor who had performed a vocational evaluation of Wife prior to trial. Because of Wife's level of education and the fact that she was primarily educated in Iran, Ms. Jones thought it was important to administer an achievement test to gauge Wife's abilities in basic subjects. She used standardized testing commonly used in her field as a brief assessment of educational achievement. Ms. Jones testified that Wife's greatest problem areas were in language and verbal skills. Her word reading, sentence comprehension, and spelling were all below the tenth percentile. Her verbal language scores were in the fifth to ninth percentile. Wife's math computation skills were better but only at the eighteenth percentile. Her "grade level" equivalency was between grades five and eight for each of the various subjects. Given that Wife did not speak English as her first language, Ms. Jones was not surprised at the low

_____

[5] The Tennessee Uniform Transfers to Minors Act is codified at Tenn. Code Ann. § 35-7-101, et seq.

- 9 -

reading comprehension levels. She explained that this level of performance was common for someone who did not have a broad background in the English language. Ms. Jones testified that Wife was "very cooperative" and appeared to be making a genuine effort, even asking to revisit questions again when she finished. Ms. Jones had been trained to identify when people might be trying to manipulate a test, but she did not have any such concerns about Wife.

Ms. Jones also testified that Wife could text message on her smartphone but did not email regularly because of her difficulty writing in English, and she did not know how to use Word or Excel, which were basic programs used in the workplace. Ms. Jones testified that Wife had no meaningful work history or work skills. Ms. Jones also administered a career assessment inventory for Wife, which was meant to help her choose a job consistent with her interests. She testified that the jobs for which Wife indicated the highest level of interest would require one to two years of training or education. In addition, Ms. Jones opined that Wife would probably need one year of adult basic skills training to improve her language skills before beginning that additional education. Wife was around age 55 at the time of trial, so Ms. Jones estimated that Wife could complete such training by around age 58. At that age, Ms. Jones believed that the additional benefit Wife would eventually earn in the workplace would be outweighed by the cost of such training.

Ms. Jones researched the median earnings of female high school graduates at age twenty, nationally and in Nashville. She considered the income for two readily available job examples: fast food workers and retail sales workers. Using these figures, Ms. Jones estimated that Wife could earn between $17,000 and $19,000 per year if she was able to find a fulltime job. Ms. Jones confirmed that Wife had not applied for any jobs during the divorce proceeding.

Wife continued to reside in the marital residence at the time of trial, as it had not been sold. Because of the delays with the home repairs, it was only placed on the market in October 2018, three months before trial. The home had three levels with an elevator, six bedrooms, eight full and three half baths, a theater room, an exercise room with a steam shower, two full kitchens, six fireplaces, laundry rooms on each level, a pool with a fountain and outdoor shower, and a heated driveway. The home had recently been appraised for $2.2 million, and it was listed for sale at $2.5 million. Wife predicted that after the sale and payment of the mortgage and the sales commission, the parties would receive around $649,000 in proceeds from the sale of the home.

Wife was taking seven medications on a daily basis for issues such as attention deficit disorder, depression, thyroid issues, and neck pain. She had previously had surgery due to cancer and been hospitalized due to a blood clot but was in fairly good health at the time of trial. Wife was considering looking for a job but had not yet started searching. Her only source of income was the $7,000 per month pendente lite support payment from Husband pending the sale of the marital residence. Husband also continued to pay the

mortgage, property taxes, utilities, and insurance for the parties.

Wife's post-divorce income and expense statement listed zero income and $13,934 in monthly expenses. She testified that this level of spending reflected the standard of living during the marriage. Wife planned to move to Denver and buy a house there in order to be near her family. She sought an award of alimony in futuro of at least $10,000 per month.

A significant amount of testimony focused on the issue of whether Wife might own an interest in property in Iran. She was one of five children. Her mother was around 83 years old, and her father had passed away in 2010. Wife testified that she did not even know if her father had a will until the issue was brought up during this divorce proceeding. Her sister in Denver was the personal representative of her father's estate when he died, and Wife had executed a power of attorney giving her sister authority to act for Wife. Wife testified that when her father died, she and her siblings inherited their childhood home in Iran, but the house was sold and most of the money went to pay off a large debt owed by her brother. Wife's sister who had power of attorney signed the necessary sale documents for herself and for Wife. Wife said her remaining share of the proceeds was around $80,000, but that was not money that she ever actually received. Wife explained that she never actually received any money after her father's death, as individuals were unable to bring money from a bank in Iran to the United States because of the relationship between the two countries. Because of the inability to transfer the funds, her sister took each of the three sisters' shares of the inheritance and gave the money to a cousin to invest in real property. Wife testified that they collectively purchased a condominium, but that an Iranian bank put a lien on the property and took that property due to debts owed by their father and brother. Thus, she testified at trial that this real estate was "gone."

Wife testified that her mother had come to live in the United States for a few years but that she also still owned a home in Iran. Wife further testified that she learned during this divorce proceeding that her mother had put the home in Iran in the names of her three daughters but retained the right to live there.[6] An English translation of the original Persian "Conveyance Document" was introduced at trial, and it stated that "[t]he interests of the conveyed real estate will belong to the conveyor during her lifetime (for 30 years)[.]" During discovery, Wife had stated that she had "no present interest" in the property, the home was titled to her mother as "something akin to a life tenant," and Wife would "guess" the home was worth around $850,000 in U.S. currency. At trial, Wife insisted that she really did not know how much the home was worth. In the event of her mother's death, Wife said she also expected to receive one-fifth of a one-fifth share of her family's rug business in Denver, equivalent to four percent, in the event that the business was still ongoing at that time.

---

[6] Wife's sister testified during her deposition that their mother had power of attorney "from all of us" and could sign for the siblings.

In addition to presenting the testimony of the various accountants and appraisers, the parties introduced into evidence thousands of pages of exhibits. At the conclusion of the four-day trial on January 30, 2019, the trial court took the matter under advisement. Before the trial court entered a written order in the matter, Wife filed a motion to reopen the proof to consider the parties' 2018 joint tax return. The trial court entered an order reopening the proof upon agreement of the parties. The order stated that the proof would be reopened in an effort to more accurately ascertain Husband's correct income and to further consider the valuation of MSM.

The trial court heard additional testimony on June 17, 2019. According to the parties' tax return, Husband had an adjusted gross income of $396,200 for 2018. Husband testified that this sum included his salary of around $204,000; profit from MSM of $20,000; and $164,000 in rental income that he never actually received in hand. He testified that the $20,000 profit was taxable as income to him even though he never withdrew that amount from the company, although he acknowledged that he could have done so. He testified that if one considered his tax liability of $75,000, he only "realized" $130,000 for the year. Husband said that he was also continuing to borrow shareholder loans from MSM in order to afford paying the mortgage and bills on the marital home and pendente lite alimony of $7,000 per month. Husband acknowledged that he continued to drive the Porsche and pay its $2,000 monthly payment. Husband's expert, Mr. Alexander, also testified regarding Husband's income and answered some questions for the trial judge regarding alternative valuations of MSM.

The trial court entered a final decree of divorce on June 27, 2019. The order itself spanned forty-five pages, and additional spreadsheets were attached. Wife was awarded a divorce from Husband on the ground of inappropriate marital conduct. After making various findings regarding the parties' educational, work, and medical histories, and summarizing the relevant events surrounding their thirty-year marriage, the trial court proceeded to equitably divide the marital estate. The marital home was still listed for sale. The trial court found that it was a marital asset with a fair market value of $2.2 million based on the most recent appraisal. The trial court added, "The property is currently on the market for sale, and the sale price shall determine the actual fair market value of the property and the resulting proceeds subject to division. However, for the purposes of the Court's division of assets, the Court will use the appraised value." After subtracting the mortgage indebtedness, the HELOC loan of $130,000, and an eight percent sales commission of $176,000, the trial court found that "the anticipated equity subject to division will be $649,065."

The trial court found that the fair market value of the unencumbered Cinnamon Place property was $360,000, such that the value of Husband's one-half share after subtracting a real estate commission would be $165,600. The trial court found that the fair market value of the Smyrna commercial property was $9.9 million, but after subtracting

the mortgages, the resulting equity would be $3,071,328, and Husband's one-half share would be $1,535,664. The court found that Husband's interest in the real property at the time of the marriage was valued at $82,000, and this would constitute his separate property. However, the remaining appreciation in equity would constitute marital property. As such, the final value of the Smyrna property as a "marital asset" was $1,453,664.

After an in-depth analysis of the expert reports and valuations, the trial court valued Husband's one-half interest in MSM at $2,420,000. The court valued Husband's share of MSM at the time of the marriage at $250,000, which would constitute his separate property. Therefore, the final value of MSM as a "marital asset" was $2,170,000. Next, the trial court noted Husband's insistence that the value of his interest in MSM "should be offset against the amount of the loans which he owes to the company." The trial court noted that if it subtracted the $1.7 million in shareholder loans from its finding as to the value of the marital asset, Husband's interest in MSM would only be valued at $388,376. Ultimately, the trial court declined to deduct the *full* amount of the shareholder loan, with the following explanation:

> . . . Wife had neither control over the Husband's borrowing from the company nor any input into how the loan proceeds were spent. While some of these proceeds clearly benefited the Wife either directly or indirectly, other such expenditures were detrimental to her by reducing the value of her equitable interest in the parties' share of the business.
>
> The Wife alleges that the Husband has dissipated the marital estate by his extravagant lifestyle, both before the filing of her complaint for divorce in September, 2016 and during the approximate 29 months that the divorce action was pending. Among these expenses were $1,928 per month for a 2016 Porsche sports car totaling approximately $44,342; $3,000 to $3,200 per month for an apartment totaling approximately $87,000, when cheaper alternatives were readily available; the payment of the parties' adult children's living expenses including his adult daughter's rent, utilities and car note and his son's apartment rent and leased vehicle; paying the children's personal expenses on the MSM Industries' credit card and his Citi Bank credit card in the amounts of $9,068 and $46,857 respectively; deposits directly into his adult son's checking account in the amount of approximately $22,314; and deposits totaling approximately $40,000 into his adult children's U[TM]A accounts during the pendency of this action. The Court finds the total of these extravagant, unnecessary and dissipative expenses to be approximately $249,581. (See Trial Exhibits #97, #107A and B, #108, #109 and the Court's *pendente lite* order dated July 14, 2017.) Control over the charges that the Husband made on the company's credit card each month was his alone. He directed the company's accountant as to which expenses were to be treated as business-related and which expenses were his personal expenses, adding to his growing loan balance owed to the company. Further,

- 13 -

there was never any accounting of his personal expenditures. Based on the evidence, it is clear to this Court that a portion of these charges were for accommodations for another adult, and on occasion a child, to join him while he was purportedly out-of-town on business. There is no evidence that these "guests" were the Wife or the parties' children. Indeed, the evidence is to the contrary. Such expenditures were not in furtherance of the parties' marital relationship and, therefore, constitute a further dissipation of the parties' marital assets. Considering the above dissipation, the exact amount of which is impossible to calculate; the tremendous disparity in the parties income; and the likelihood that the Husband will never be required to repay his share of loans from the company, the Court finds that of the $1,781,624 the Husband borrowed from the company, $1,350,000 of the loans constitute legitimate marital expenses from which the Wife received benefits and shall be offset against the value of the company. The remaining $431,624 shall constitute the Husband's dissipation in the amount of $249,581 and approximately $182,043 in separate debts for which he shall not receive credit against the value of the company and for which he shall be personally responsible. Based on the foregoing, the Court finds the value of the parties' interest in MSM Industries to be $820,000. Further, the Court finds that the Husband shall be personally responsible for the total indebtedness which he has borrowed from MSM Industries and shall indemnify and hold the Wife harmless thereon.

The trial court found that Wife owned a one-third interest in her mother's home in Iran, which was gifted to her by her mother. The trial court found that neither party expressed an opinion as to the value of the property or provided the court with an appraisal. "Without competent evidence," the trial court explained, "the Court cannot determine the value of the property but does find that the Wife's interest constitutes her separate property."

In sum, the trial court found that the total value of the parties' marital estate was $3,292,816. The trial court proceeded to make findings regarding every statutory factor listed for consideration when equitably dividing the marital estate. *See* Tenn. Code Ann. § 36-4-121(c). Considering all of the factors, the trial court concluded that "the marital estate should be divided disproportionately in favor of the Wife." By necessity, the trial court noted, Husband would be awarded MSM, which would produce substantial income and allow Husband to acquire future assets. However, the trial court explained, there was no income-producing property available to award to Wife to generate income for her. Therefore, the court found it equitable to award Wife "approximately 60%" of the marital estate and Husband "approximately 40%." The trial court awarded Wife sixty percent of the anticipated sale proceeds from the house and awarded Husband forty percent. Wife was awarded the Audi, while Husband was awarded the Porsche. Husband was also awarded the parties' Gulfstream recreational vehicle valued at $40,000. The trial court

valued and allocated the parties' various checking and savings accounts totaling around $17,000, their investment and retirement accounts totaling approximately $134,000, and the furnishings in the marital residence and the business. Because Husband was awarded all of the business-related marital assets, Wife was awarded a judgment against Husband "to adjust the equities between the parties" and to accomplish an equitable division of the marital estate. Specifically, Husband was ordered to pay a judgment of $1,325,170 in favor of Wife, at the rate of $100,000 per year until paid in full. Upon the sale of the marital home, Husband's share of the proceeds would be applied to the outstanding judgment owed to Wife.

The trial court then considered the issue of spousal support. Again, the trial court expressly considered all of the statutory factors for consideration when awarding alimony. *See* Tenn. Code Ann. § 36-5-121(i). It concluded that Wife had an earning capacity of between $17,000 and $19,000 per year. It found that Husband had a pre-tax pre-interest "cash flow" of $536,056 per year from 2015 to 2017. It found that his income based on his tax returns was approximately $400,000 during those years and also in 2018. The trial court found that many of Husband's monthly expenses were excessive and unnecessary and/or duplicative. Despite his significant expenses, the trial court found that "he has the ability to pay spousal support." The court also found many of Wife's monthly expenses excessive and reduced or eliminated many. The trial court ultimately concluded that Wife had a need of $9,644 per month based on legitimate expenses. However, it found that she should be capable of earning $1,500 per month ($1,336 after taxes). As such, it found that she needed $8,308 per month in alimony in futuro. The order provided that Husband would not begin paying alimony in futuro until the marital residence sold, and he was directed to continue complying with the pendente lite support order until that time.

Finally, the trial court addressed the issue of attorney's fees. The trial court noted that Wife claimed approximately $70,000 in outstanding attorney's fees and $29,707 in expert witness fees. Husband claimed to have unpaid attorney's fees totaling $108,940. The trial court discussed the fact that Husband experienced difficulties during the litigation securing information regarding Wife's interests in assets, including those in Iran. It found that Wife had likely failed to exercise any due diligence to determine whether any ownership interest existed. Because of her inaction, the trial court found, Husband was required to take depositions of Wife's family members outside the State of Tennessee. The trial court acknowledged that Wife's interest in the property in Iran was difficult for her to access and utilize but noted that it was nonetheless an ownership interest. The court found that Husband was compelled to expend unnecessary resources in an effort to secure information that should have been forthcoming and easily ascertainable by Wife. It found that Husband should not be responsible for the additional and unnecessary attorney's fees and litigation costs that resulted. The trial court also acknowledged that Husband had already paid a portion of Wife's attorney's fees and expert fees during the litigation. As a result, it ordered Husband to pay $40,000 of Wife's outstanding attorney's fees in addition to her expert fee of $29,707.

Within days of the entry of the final decree of divorce, an agreed order was entered reducing the listing price of the marital home from $2.5 million to $2.2 million. Wife filed a motion to alter or amend, asking the court "to reexamine the issue of attorney's fees" and increase her award. She acknowledged that her outstanding attorney's fees as reflected on an exhibit at trial totaled $70,769.80. However, Wife claimed that the aforementioned exhibit only reflected what she owed "up to the date the trial commenced." Wife asserted that she currently owed $124,851.69 in attorney's fees, including the "trial fees" she incurred. Additionally, Wife acknowledged that her trial exhibit reflected $29,707.01 owed to her expert witness at the time of trial, but Wife claimed that she "now owes" $55,378.05 with the trial fees she incurred. Accordingly, Wife asked the court "to consider these total amounts owed in apportioning attorney fees and make any changes to Husband's responsibility for Wife's fees that the Court deems necessary under the circumstances." Husband filed a response arguing that the case was tried over the course of five days, during which the trial court thoroughly considered all issues presented, and that there was no reason to relitigate the issue of attorney's fees. After another hearing, the trial court entered an order providing that "Wife's request for the Court to consider Wife's trial and post trial attorney fees and reallocate the share of fees for which [Husband] would be responsible is denied." Husband timely filed a notice of appeal to this Court.

## II.   ISSUES PRESENTED

Having retained new counsel on appeal, Husband presents the following issues for review, which we have quoted from his brief but rearranged:

1.      Whether the trial court's calculation of the marital estate and property division improperly relied on the appraised and inflated value of the marital home when the trial court found that the home's true value is its ultimate sale price?

2.      Whether the court-ordered extensive payments to maintain the marital home while the home is listed for sale should be credited to [Husband] and made a part of the property division when they greatly exceed his proven cash-flow and the court-ordered alimony payments to [Wife]?

3.      Whether the evidence preponderates against the trial court's finding of dissipation during the divorce proceedings regarding [Husband's] paying apartment rent, car payments, and support for the parties' adult children, resulting in an erroneous valuation of the marital share of the business, when (1) [Husband's] spending reflected his typical expenses during the parties' marriage; (2) the trial court treated all payments for these categories as dissipation, contrary to its own findings; and (3) the record lacked any evidence that these expenses were made to hide, deplete, or divert from

marital property?

4.        Whether the trial court's property division and alimony calculations failed to appropriately consider the parties' separate property, contrary to Tennessee statute, when (1) the evidence demonstrated [Wife] has an interest in a very substantial piece of real property; and (2) the evidence did not support the finding of [Husband's] supposed inheritance from his family, including the business?

5.        Whether the alimony award should be reversed if the property division is reversed?

6.        Whether the trial court abused its discretion in calculating alimony when (1) the trial court failed to calculate any reasonable amount of monthly expenses for [Husband]; (2) the evidence clearly demonstrates that [Husband's] cash-flow is substantially lower than the court's finding on his income; and (3) [Husband's] personal and court-ordered obligations greatly exceed his monthly cash-flow?

In her posture as appellee, Wife restated the issues raised by Husband and also presented the following additional issues for review:

1.        Whether the trial court erred when it did not order Husband to pay a larger portion of Wife's attorney's fees and expert costs; and

2.        Whether Wife is entitled to attorney's fees on appeal.

For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.[7]

---

[7] Husband argued in his reply brief that Wife had "waived a majority of her arguments on appeal by failing to include them in her statement of issues," including her arguments regarding the parties' incomes, the shareholder loans, the property in Iran, and Husband's credibility. Husband cites to various portions of Wife's brief from the statement of facts and her argument with respect to the issues of property division and alimony. We do not find that Wife waived her ability to argue these issues by failing to designate additional issues on appeal. "Rule 27 of the Tennessee Rules of Appellate Procedure [] generally only requires that an appellee's brief contain a statement of the issues presented for review '[i]f [the] appellee is also requesting relief from the judgment.'" *Wilson v. City of Memphis*, No. W2014-01822-COA-R3-CV, 2015 WL 4198769, at *11 n.9 (Tenn. Ct. App. July 13, 2015) (quoting Tenn. R. App. P. 27(b)). In *Wilson*, for example, we found no waiver where the appellee "only seeks to uphold the trial court's judgment," as she did not "appear to be seeking any affirmative relief from this Court." *Id. See also Mid-S. Maint. Inc. v. Paychex Inc.*, No. W2014-02329-COA-R3-CV, 2015 WL 4880855, at *9 (Tenn. Ct. App. Aug. 14, 2015) (explaining that "if Appellees' argument . . . seeks affirmative relief from this Court, their failure to designate this argument as an issue in their brief will be fatal to this Court's review.") Here, Wife restated and responded to Husband's issues and asked this Court to affirm the trial court's

## III. DISCUSSION

### *A. Valuation of the Marital Home*

The first issue we will address is Husband's contention that "the trial court's calculation of the marital estate and property division improperly relied on the appraised and inflated value of the marital home when the trial court found that the home's true value is its ultimate sale price." Husband asserts that "[t]he trial court's decision to use the actual value of the marital home, which it ordered must be sold, to value the marital estate, while at the same time using the much higher appraised value of the home to calculate the property division, was fatally inconsistent and must be reversed."

Despite Husband's contention, we find nothing in the record to suggest that the trial court "valued the marital home in two contradictory ways" or used a "much higher" appraisal value that exceeded "the actual value" of the marital home. The final decree of divorce states,

> The Court finds [the marital home] to be a marital asset with a fair market value of approximately $2.2 million based on the certified appraisal introduced into evidence. (See Trial Exhibit #28.) . . . The property is currently on the market for sale, and the sale price shall determine the actual fair market value of the property and the resulting proceeds subject to division. However, for the purposes of the Court's division of assets, the Court will use the appraised value.

After subtracting the mortgage and HELOC balances and the estimated real estate commission, the trial court found "the anticipated equity subject to division will be approximately $649,065." The home was listed for $2.5 million at the time of trial. However, within days of the entry of the divorce decree, the parties agreed to lower the price from $2.5 million to $2.2 million.

Husband asks this Court to "reverse the property division to clarify what the trial court meant[.]" The only caselaw he cites in support of this issue is *McAlister v. McAlister*, No. M2009-02379-COA-R3-CV, 2010 WL 2977873, at *1 (Tenn. Ct. App. July 28, 2010), which involved a post-divorce petition to enforce a final decree filed eight years after its entry. As in this case, the final decree referred to both percentages and precise numbers. *Id.* The divorce decree stated:

> [T]he Court makes the finding that the value of the marital residence is $112,500.00. . . . The Court finds that each party's reasonable share of that residence is 50% or $56,250.00 each. It is ORDERED, ADJUDGED AND

---

rulings. She did not waive those arguments by failing to designate additional issues.

DECREED that the Court awards to [Wife] as alimony in solido one-half of [Husband's] share of $56,250.00, for an additional share of the house awarded to [Wife] in the amount of $28,125.00. Therefore, when the house is sold and if the same does bring $112,550.00, [Husband's] share would be $28,125.00. The remaining balance is hereby awarded to [Wife]. The Court therefore awards to [Wife] 75% of the marital residence and 25% of the marital residence is awarded to [Husband], the value of which as of this date awarded is $28,125.00. The Court further finds that to provide [Wife] with her 75% share of [Husband's] Pepsico Deferred Compensation Account, the Court awards her an additional four percent (4%) of the value of the marital residence. Therefore, when the house is sold upon the youngest child turning 18, [Wife] shall receive 79% of the proceeds as her one-half share of the marital residence plus the alimony in solido plus her 75% share of the Pepsico Account, which is a distribution of marital property. Therefore, with the percentage the Court has finally arrived at, [Husband's] share of the marital residence is 21% or the amount awarded to [Husband] as a share of the marital residence is placed at $23,625.00, which amount he shall be paid when the marital residence is sold when the youngest child reaches the age of 18 or graduates from high school whichever is last.

*Id.* at *2. When the house was sold years later, the wife insisted that the husband was bound by the "specific dollar figure[s]" cited in the decree, while the husband claimed that he was required to pay her the percentage. *Id.* at *3. This Court agreed with the husband. We explained:

The Final Decree uses the dollar figures to illustrate how the holding with regard to the percentages will play out if, and only if, the house sells for a specific stated amount. This position is shown by the Trial Court's use of the wording "when the house is sold and *if the same does bring $112,550.00, ....*" (emphasis added). By clear implication, if the house does not bring that amount when sold then the numbers used in the illustration will change. The Trial Court placed a value on the house at the time of the divorce in order to assist it in equitably distributing the marital property. However, the Trial Court implicitly acknowledged that it had no way of knowing how much the house would sell for as the Final Decree provided that Wife could remain in the house until "the youngest child reaches the age of 18 or graduates from high school whichever is last." If the house now sells for more than the value placed upon it in the Final Decree, then both parties will receive the benefit of any increase in value. Conversely, both will share the loss if there is a decrease in value. We do not find that the Final Decree intended for Wife alone to benefit from such a potential windfall or to bear such a potential loss.

Although perhaps not written as clearly as possible, the Final Decree

- 19 -

provided that if the parties could not agree on the disposition of the house it would be sold, with Husband to receive 21% of the net proceeds and Wife to receive 79% of the net proceeds.

*Id.* at *4.

In the case before us, the trial court's order stated that the court was using the appraised value for purposes of equitably dividing the marital estate but that "the sale price shall determine the actual fair market value of the property and the resulting proceeds subject to division." As such, the trial court only calculated $649,065 as "the *anticipated* equity subject to division." (emphasis added). There is no need for additional clarification at this point. As in *McAlister*, because the trial court used percentages, "both parties will receive the benefit of any increase in value," and "both will share the loss if there is a decrease in value."[8] *Id.*

## B. Credit for Pendente Lite Payments

Next, Husband argues that "[t]he over $350,000 in payments that [Husband] has made to maintain the marital home while it was waiting to be sold should be credited towards him, and considered as part of the property division, requiring a reversal of the property division." Husband's calculation appears to consist of the amount he had paid from the date of the pendente lite order until the filing of his brief on appeal. He does not cite any authority in support of this argument except for "the statute for dividing marital property," Tenn. Code Ann. § 36-4-121(c).[9] In addition, he fails to cite to any location in the record to demonstrate that he raised this argument during the five-day trial or at any other stage before the trial court. Husband did not mention this argument in his pretrial brief or include such a "credit" in his proposed division of marital property submitted as an exhibit at trial. As such, we deem the argument waived on appeal. See *Martin v. Rolling Hills Hosp., LLC*, 600 S.W.3d 322, 336 (Tenn. 2020) ("[A]s a general rule, issues raised for the first time on appeal are waived.") (quotation omitted).

## C. Shareholder Loans

We now turn to the more complicated issue regarding the valuation of MSM, the shareholder loans, and dissipation. "Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division." *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014). "'[W]hen valuation evidence is

---

[8] We reject Husband's suggestion that the equalizing judgment awarded to Wife must also be changed depending on the ultimate sale price of the house.

[9] This Court found it improper to adjust the division of marital property for pendente lite alimony received during the divorce proceedings in *Barnes v. Barnes*, No. M2012-02085-COA-R3-CV, 2014 WL 1413931, at *11-13 (Tenn. Ct. App. Apr. 10, 2014), and in *Zimmerman v. Zimmerman*, No. M2008-01722-COA-R3-CV, 2009 WL 1608990, at *7 (Tenn. Ct. App. June 9, 2009).

- 20 -

conflicting, the court may place a value on the property that is within the range of the values represented by all the relevant valuation evidence.'" *Brown v. Brown*, 577 S.W.3d 206, 214 (Tenn. Ct. App. 2018) (quoting *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007)). Because "decisions regarding valuation of property present issues of fact, [] the trial court's decision regarding value is entitled to great weight on appeal and 'will not be second-guessed unless [it is] not supported by a preponderance of the evidence.'" *Id.* at 214-15 (quoting *Owens*, 241 S.W.3d at 486).

After valuing the property, "the trial court must divide the marital estate equitably by weighing the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c)." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234 (Tenn. 2010). One of those statutory factors requires the court to consider:

> (5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
>
> (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

Tenn. Code Ann. § 36-4-121(c)(5). Thus, "[a] party's dissipation of marital or separate property is one of many factors a trial court may take into consideration in making an equitable division of a marital estate." *Trezevant v. Trezevant*, 568 S.W.3d 595, 616 (Tenn. Ct. App. 2018). "Whether a party has dissipated marital assets is a finding of fact to be made by the trial court." *Wise v. Bercu*, No. M2017-01277-COA-R3-CV, 2019 WL 4747187, at *11 (Tenn. Ct. App. Sept. 30, 2019). "Whether dissipation has occurred depends on the facts of the particular case." *Larsen-Ball*, 301 S.W.3d at 235 (citing 24 Am.Jur.2d *Divorce and Separation* § 526 (2009)). It will often be a "'fact and credibility driven decision.'" *Slocum v. Slocum*, No. M2016-01881-COA-R3-CV, 2017 WL 4804553, at *6 (Tenn. Ct. App. Oct. 24, 2017) (quoting *Watson v. Watson*, 309 S.W.3d 483, 492 (Tenn. Ct. App. 2009)).

Our analysis of this issue is somewhat complicated by the fact that this case does not involve a mere wasteful expenditure of a singular marital asset. As Husband notes in his brief, the trial court's finding of dissipation was "imbedded" within its business valuation of MSM. Husband's spending led to the creation of a substantial debt, which, although not characterized as "marital debt" by the parties, had the effect of reducing the value of a sizeable marital asset. Indeed, using the valuation figures calculated by

Husband's expert, Husband claimed that he had *no* marital equity or interest remaining in MSM at the time of the divorce trial, and he proposed that MSM should simply be listed as a *negative* interest on the marital balance sheet. Thus, the trial court's decision with respect to this issue involved the valuation of a marital asset, the consideration of debt, and related issues of dissipation. The trial court discussed the issue of dissipation in the section of the divorce decree valuing the marital property and again when discussing the statutory factors for equitably dividing the marital estate, particularly factor (c)(5).

No matter how we precisely characterize the issue, the trial court's decision on such matters is entitled to deference on appeal. Appellate courts "give great weight to the trial court's division of marital property and 'are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *Larsen-Ball*, 301 S.W.3d at 234 (quoting *Keyt v. Keyt,* 244 S.W.3d 321, 327 (Tenn. 2007)). The division of the marital estate "is not a mechanical process," and the trial court has "broad discretion" in its decision. *Id.*

To briefly recap, Husband and his father had historically taken what they designated as "shareholder loans" from MSM over and above their traditional salaries. They used the company credit cards for both personal and business expenses, and MSM paid the monthly credit card bills. Husband would tell the company's accountant which expenses he deemed "personal" or "business," and the personal expenses would be recorded as a "loan" to Husband. There was no loan document, no collateral, and no interest owed or paid. Husband would void his monthly paycheck, and that amount would be credited as a payment toward his loan balance. In August 2016, before the complaint for divorce was filed on September 8, Husband owed $592,285.96 in shareholder loans. However, his loan balance tripled during the divorce proceeding. In addition to his traditional compensation, Husband charged $614,985.70 in shareholder loans in 2016; $449,420.17 in shareholder loans in 2017; and around $383,000 in 2018. His loan balance was at an all-time high of $1,781,624.46 by November 2018, shortly before trial. His father's loan balance was only $128,119.27. Some of Husband's credit card charges benefitted Wife, such as payment of the mortgage for the marital home and the parties' attorneys' fees. However, many of the other charges did not benefit Wife, such as Husband's apartment rent and related bills, part of the payment for his Porsche, and living expenses for his grown children.

The trial court valued the marital portion of Husband's one-half interest in MSM at $2,170,000. The court noted Husband's argument that his entire shareholder loan balance of $1,781,624 should be offset against that value when valuing the parties' marital asset. The trial court noted that if it did so, the value of Husband's marital interest in MSM would only be $388,376. The trial court ultimately declined to offset the entire balance of the shareholder loan, finding that a portion of the loan represented "dissipation of the parties' marital assets" by Husband. Specifically, the trial court only offset $1,350,000 of shareholder loans against the value of the business as "legitimate marital expenses,"

holding that the remaining $431,624 in shareholder loans constituted dissipation by Husband. By our calculation, the trial court deemed 75% of the shareholder loans as legitimate and 25% as dissipation. This resulted in the trial court reducing its valuation of the parties' marital share of MSM from $2,170,000 to $820,000 because of the shareholder loans.

The trial court gave a lengthy explanation for its decision to classify a portion of the shareholder loans as dissipation. Simply put, the trial court found that "during the pendency of this divorce, the Husband has dissipated the marital estate by his extravagant spending." The court found that Wife did not have control over Husband's borrowing from the company or any input into how the shareholder loans were spent. It found that some expenditures did not benefit her and in fact "were detrimental to her by reducing the value of her equitable interest in the parties' share of the business." For instance, the trial court specifically found certain charges "extravagant, unnecessary and dissipative," including $1,928 per month on Husband's new Porsche, totaling $44,342 in payments during the divorce proceeding; $3,000 to $3,200 in monthly apartment rent, totaling $87,000 during the divorce proceeding; rent, utilities, and car payments for the grown children, for which the trial court did not assign a total value; $55,925 in credit card charges by the grown children; $22,314 in deposits to the adult son's checking account; and $40,000 in deposits to the children's investment accounts. The total of these specifically mentioned charges was $249,581 (without including any value for rent and vehicles for the children).[10] The trial court found that Husband "insist[ed] on" driving a new Porsche and "insisted on" renting an apartment for $3,200 per month when cheaper alternatives were readily available, he could have remained in the marital residence, and he and his father owned the four-bedroom Cinnamon Place residence nearby. It found that he contributed to the grown children's investment accounts and paid their rent, utilities, car insurance, telephone service, and automobile leases. "To fund all of the foregoing," the trial court found, "Husband was borrowing against his business equity." By listing these expenses as loans from the business, Husband was "diminishing the value of [his] and Wife's ownership interest." The court found that there was never any accounting of his personal expenditures, and Husband had total control over the business with little to no accounting to his elderly father. It found that "his repayment of the approximately $1.78 million debt to [MSM] [was] unlikely." The trial court found that some of Husband's additional charges were for travel accommodations that included another adult that constituted "further dissipation" of marital assets. It found Husband's explanation of his hotel bookings "was unconvincing and not credible." The trial court found that it was "impossible to calculate" the exact amount of Husband's dissipation. However, considering all of these facts, the tremendous disparity in the parties' incomes, and "the likelihood that the Husband will

---

[10] It appears that the trial court may have inadvertently omitted a value for the payment of the children's rent, utilities, and car payments. However, the trial court cited an exhibit that listed $56,429.49 in spending for this category in 2016 and $29,784.67 in spending for this category in 2017. In Husband's brief on appeal, he included an additional sum of $78,300 for this category.

never be required to repay his share of loans from the company," the trial court limited the offset against the value of MSM to only $1,350,000 of the claimed loans. The trial court added, "The remaining $431,624 shall constitute the Husband's dissipation in the amount of $249,581 and approximately $182,043 in separate debts for which he shall not receive credit against the value of the company and for which he shall be personally responsible." The trial court found that subtracting these sums from the shareholder loans "adjusted the equities" between the parties.

The sole issue Husband raises on appeal is whether his spending met "the legal requirements for dissipation." In response, Wife maintains that Husband's spending did qualify as dissipation. However, Wife points out that the trial court additionally found it "highly unlikely" that Husband would ever repay his shareholder loan. She notes her position at trial was that the value of MSM should not be reduced by these so-called "loans." Wife suggests that the trial court reached an "equitable result" by recognizing most of the shareholder loan as genuine or "legitimate" but considering the remainder as dissipation.

"Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down." *Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005).

> The factors that courts most frequently consider when determining whether a particular expenditure or transaction amounts to dissipation include: (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Id.* at 682. According to the relevant statute, dissipation means wasteful expenditures that reduce the marital property available for equitable distribution "made for a purpose contrary to the marriage *either before or after* a complaint for divorce or legal separation has been filed." Tenn. Code Ann. § 36-4-121(c)(5)(B) (emphasis added). "The timing of the expenditure or transaction is extremely relevant. It is unlikely that expenditures that were typical or commonplace during the marriage will constitute dissipation, especially when the other spouse acquiesced in them." *Altman*, 181 S.W.3d at 683 n.5.

Husband seems to suggest that because the parties typically spent extravagantly during the marriage, he could continue to spend as he desired during the divorce. We respectfully disagree. Tennessee Code Annotated section 36-4-106 provides:

- 24 -

(d) Upon the filing of a petition for divorce or legal separation, and upon personal service of the complaint and summons on the respondent or upon waiver and acceptance of service by the respondent, the following temporary injunctions shall be in effect against both parties until the final decree of divorce or order of legal separation is entered, the petition is dismissed, the parties reach agreement, or until the court modifies or dissolves the injunction, written notice of which shall be served with the complaint:

(1)(A) An injunction restraining and enjoining both parties from transferring, assigning, borrowing against, concealing or in any way dissipating or disposing, without the consent of the other party or an order of the court, of any marital property. . . .

(B) Expenditures from current income to maintain the marital standard of living and the usual and ordinary costs of operating a business are not restricted by this injunction. Each party shall maintain records of all expenditures, copies of which shall be available to the other party upon request.

Tenn. Code Ann. § 36-4-106. "Thus, the legislature has provided that parties to a divorce action are charged with preserving the marital estate during the pendency of the divorce." *Armstrong v. Armstrong*, No. M2006-02713-COA-R3-CV, 2008 WL 624862, at *8 (Tenn. Ct. App. Mar. 5, 2008). When dividing the marital estate, courts are directed to consider the "contribution of each party to the acquisition, *preservation*, appreciation, *depreciation or dissipation*" of the marital property. Tenn. Code Ann. § 36-4-121(c)(5)(A) (emphasis added). The trial court can allocate marital debt in a manner that will "protect the spouse who did not incur the debt from bearing responsibility for debts that are the result of personal excesses of the other spouse." *Alford v. Alford*, 120 S.W.3d 810, 814 (Tenn. 2003).

On appeal, Husband asks this Court to review some of the individual categories of spending mentioned by the trial court and to alter the totals for each category. For instance, Husband acknowledges that he and his wife were leasing vehicles during the marriage, and when his lease expired on his "older Porsche" during the divorce proceeding, he "chose to purchase a newer Porsche for $1,927.94 per month." This was an increase from his previous monthly lease payment of $1,306.35. Husband argues that his purchase of a newer Porsche was not so atypical as to amount to dissipation, or if it was, then the trial court should have limited the dissipation finding to the amount of the increased payment. As for the expenditures on the children, Husband does not dispute most of that spending but does deny that he deposited as much money into his son's checking account as recited by the trial court.[11]

---

[11] Husband does not dispute that his spending included around $175,000 for his grown children, including $78,300 for their "living expenses" such as rent, utilities, and car notes; $55,925 for the children's credit card charges; $40,000 in deposits to their investment accounts; and two to three thousand dollars in

We decline Husband's invitation to tweak the trial court's valuation of MSM in such a piecemeal fashion. *See Telfer v. Telfer*, 558 S.W.3d 643, 657 (Tenn. Ct. App. 2018) ("We are very much disinclined to tinker with a lower court's decisions regarding the division of a marital estate."). Ultimately, the appropriateness of a trial court's division depends on its results. *Pack v. Pack*, No. M2018-00491-COA-R3-CV, 2019 WL 1934818, at *7 (Tenn. Ct. App. Apr. 30, 2019); *see, e.g.*, *Singla*, 2018 WL 6192232, at *25 ("The finding that Husband did not dissipate as much of the marital assets as found by the Trial Court does not change the analysis in any significant manner. We find no error in the Trial Court's distribution of the marital assets as the distribution remains equitable[.]"); *Bewick v. Bewick*, No. M2015-02009-COA-R3-CV, 2017 WL 568544, at *10 (Tenn. Ct. App. Feb. 13, 2017) ("[E]ven assuming that Husband did not dissipate assets to the extent found by the trial court, we find no basis to disturb the trial court's division of the marital estate."); *Altman v. Altman*, 181 S.W.3d 676, 681 (Tenn. Ct. App. 2005) ("While we have determined that the evidence does not support the trial court's conclusion that Ms. Altman dissipated marital funds[], we find that the manner in which the trial court divided the marital estate was equitable based on the factors in Tenn. Code Ann. § 36-4-121(c)."); *Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *7 (Tenn. Ct. App. Mar. 7, 2001) ("[T]he trial court erred by concluding that Mr. Wix had dissipated a marital asset . . . . However, this error does not undermine the remainder of the trial court's analysis regarding the division of the marital property and the allocation of the parties' debts.")

Here, the trial court acknowledged that it was impossible to calculate the exact total of Husband's wasteful and unnecessary expenditures. Even if we were to conclude that some portion of the expenditures would not neatly fit the definition of dissipation, the trial court was still authorized to consider Husband's extreme spending and record-high shareholder loan balance as a failure to preserve MSM as a marital asset. "Under Section 36-4-121(c)(5), in dividing the marital estate, the trial court is also directed to consider the contribution of each party toward the 'preservation' of marital or separate assets." *Hayes v. Hayes*, No. W2010-02015-COA-R3-CV, 2012 WL 4936282, at *8 (Tenn. Ct. App. Oct. 18, 2012). In the context of marital property, "preservation" of assets means "'keeping [them] safe from harm; avoiding injury, destruction, or decay; *maintenance . . . not the creation, but the saving of that which already exists, and implies the continuance of what previously existed*.'" *Id.* (quoting *Flannary v. Flannary*, 121 S.W.3d 647, 651 (Tenn. 2003)) (emphasis added). "If a party is found to have dissipated or 'failed to preserve' a marital asset the trial court may adjust the division of marital property accordingly." *Armstrong*, 2008 WL 624862, at *8.

In *Pack v. Pack*, No. M2018-00491-COA-R3-CV, 2019 WL 1934818, at *7 (Tenn.

---

deposits to their son's checking account. *Compare Singla v. Singla*, No. M2017-01278-COA-R3-CV, 2018 WL 6192232, at *24 (Tenn. Ct. App. Nov. 27, 2018) (affirming the trial court's finding that a husband dissipated the marital estate by transferring $45,000 to his parents for their support).

Ct. App. Apr. 30, 2019), for example, the trial court found that the husband dissipated marital assets by losing $170,000 in marital funds on risky short-term trades in the stock market. The trial court added that even if the trading did not constitute dissipation, it was appropriate to consider "as evidence of his failure to preserve the marital property." *Id.* On appeal, we held that although husband's history of wasteful expenditures would not meet the definition of dissipation "as that term is defined in the statute," it could nevertheless be considered "as a failure to preserve marital assets." *Id.* at *9. We stated, "Irrespective of whether the court mischaracterized Husband's stock trading as a 'dissipation' of marital assets or a 'failure to preserve the marital property,' this fact alone does not undermine the validity of the manner in which the trial court divided the parties' marital estate[.]" *Id.* at *8. *See also Flannary*, 121 S.W.3d at 651 ("Husband's careless handling of the funds could be characterized as a failure to preserve a marital asset under Tennessee Code Annotated section 36-4-121(c)(5)."); *Downing v. Downing*, No. M2010-00045-COA-R3-CV, 2011 WL 2418732, at *7 (Tenn. Ct. App. June 13, 2011) (concluding that a husband "dissipated the value" of the equity in the marital home by increasing the mortgage debt without consulting with the wife); *Deakins v. Deakins*, No. E2008-00074-COA-R3-CV, 2009 WL 3126245, at *16-17 (Tenn. Ct. App. Sept. 30, 2009) (finding that a husband's excessive and reckless spending of HELOC funds resulting in a substantial encumbrance on the marital home constituted dissipation, but noting that even if the "dissipation" finding was erroneous, it did not render the property division inequitable); *Marciante v. Perry*, No. M2006-02654-COA-R3-CV, 2008 WL 820502, at *7-8 (Tenn. Ct. App. Mar. 26, 2008) (concluding that the withdrawal of $110,000 from a retirement account for day trading and a child's college expenses did not constitute dissipation but that it could be considered regarding each party's contribution to the preservation, appreciation, depreciation, or dissipation of the marital property); *Stock v. Stock*, No. W2005-02634-COA-R3-CV, 2006 WL 3804420, at *6 (Tenn. Ct. App. Dec. 28, 2006) (concluding that a wife's role in the disappearance of $240,000 could be characterized as failing to preserve a marital asset); *Robinson v. Robinson*, No. W2003-01836-COA-R3-CV, 2005 WL 1105188, at *18-19 (Tenn. Ct. App. May 9, 2005) (concluding that a husband dissipated his businesses by failing to preserve them, when he and his father orchestrated the demise of the businesses in order to prevent the wife from receiving any value from them in the divorce).

At the outset of the divorce proceeding, Husband was admonished to limit his spending on the parties' grown children and what the trial court deemed wasteful expenditures. Instead, Husband increased his shareholder loan balance by over one million dollars in the course of two years. He was driving a new Porsche and renting an expensive apartment while at the same time claiming an inability to pay for Wife's attorney's fees or repairs to the marital home. He vehemently opposed providing spending money to Wife while at the same time providing tens of thousands of dollars to the parties' two grown children and charging it as shareholder loans. This reduced the marital property available for equitable distribution. During Husband's testimony at trial, the trial judge asked Husband directly if he was borrowing shareholder loans from MSM and using the money

to pay his grown children's expenses. Husband replied, "Yes. As I explained, Your Honor, they're my kids. I've done everything I could for them." The trial judge then responded, "First obligation is to your spouse." The trial judge observed that Husband was "using that debt to minimize the value of your company." Given the trial court's responsibility to consider Husband's "preservation" or "depreciation" of marital assets, Tenn. Code Ann. § 36-4-121(c)(5), we discern no reversible error in the trial court's decision to recognize 75 percent of the shareholder loan balance as legitimate and 25 percent as illegitimate.

This Court considered an analogous situation in *Echols v. Echols*, No. E1999-00619-COA-R3-CV, 2000 WL 688589 (Tenn. Ct. App. May 30, 2000) *perm app. denied* (Tenn. Jan. 8, 2001). In that case, the husband argued that the trial court erred by failing to find that he owed an outstanding debt to his corporation that would reduce the portion of the marital estate awarded to him by $193,596. *Id.* at *1. The husband's accountant testified that the husband incurred this indebtedness by receiving "advances" from his corporation, averaging $141,439 per year. *Id.* at *3. The corporation would periodically issue him a bonus check that would be applied to reduce his indebtedness. *Id.* His accountant explained that "[Husband] just got in the habit of he'd just make a loan and borrow it from the company and then we'd declare a bonus later and try to wipe out as much as we could of the loan." *Id.* He testified that the husband had a "salary" of about $107,000 per year. *Id.* In addressing the indebtedness, the trial court noted that the husband had control over the loans from the corporation as well as the repayment schedule. *Id.* It found that he used the loan account to control the amount of income he took from the business. *Id.* The trial court ultimately decided that it would take the debt into account, but that it would not treat the loan "as a finite figure" and that there should not be a specific reduction in the husband's estate by the amount he owed the corporation. *Id.* On appeal, we found that the evidence did not preponderate against the trial court's determination that the husband's "debt" to the corporation was "a suspect obligation" and not a "legitimate" debt. *Id.* at *3-4. We noted that the husband had exclusive control over when and by how much his indebtedness was paid, which was "not characteristic of a typical loan." *Id.* at *3. The evidence supported a finding that the "loan" was "not a debt *per se*" but "a means by which Husband could control the amount of his income" from the corporation. *Id.* Furthermore, we concluded that the husband's transfer of approximately $50,000 in marital assets to his corporation at or near the time of the divorce to purportedly reduce this suspect "debt" constituted the dissipation of marital assets. *Id.* at *5.

Again, in this case, the trial court did find it appropriate to recognize the majority of the shareholder loan as a legitimate debt.[12] This reduced the valuation of MSM (a marital asset awarded to Husband) from $2,170,000 to $820,000 solely because of the shareholder loan. However, considering the fact that the trial court found it "highly

---

[12] In the case at bar, the trial court expressed concern that "for the Court to treat such loans as a dividend could provide a basis for the Internal Revenue Service to do likewise, creating an immediate and significant tax liability for possibly both of the parties."

unlikely" that the loan would ever be repaid, combined with the fact that Husband had engaged in wasteful spending that significantly increased the amount of the loan balance, the trial court declined to recognize all of the loan balance as legitimate debt and ordered Husband to be solely responsible for the remainder in the event that it was repaid. Considering the very wide discretion afforded to the trial judge in its distribution of the marital estate, and the unique circumstances of this case, we cannot say that the trial court's decision was outside the range of acceptable alternatives. "The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Keyt*, 244 S.W.3d at 328.

## D. Separate Property

The next issue raised by Husband is "Whether the trial court's property division and alimony calculations failed to appropriately consider the parties' separate property, contrary to Tennessee statute, when (1) the evidence demonstrated [Wife] has an interest in a very substantial piece of real property; and (2) the evidence did not support the finding of [Husband's] supposed inheritance from his family, including the business?"

### 1. Wife's mother's home in Iran

First, Husband argues that the trial court abused its discretion by failing to value Wife's one-third interest in her mother's home in Iran. At a hearing on discovery matters in 2017, Husband's attorney stated, "I'm getting reports this thing might be worth $7 million." In her supplemental discovery responses in 2018, Wife stated, "I know this property to be valuable. I am not a professional appraiser, but I would guess it is worth about $850,000 US." Then, at trial in 2019, the following exchange occurred between Husband's counsel and Wife:

> Q. Ma'am, that house has a value of $850,000, doesn't it?
> A. I do not know the price. Last time prices were $7 million, so I don't know.
> Q. That house has a value of $850,000, doesn't it?
> A. I still – the answer is no. I mean, you want to do this like – each time I can say no and no and no, and then you can go on until I make a mistake and say something. But, no, I do not know how much this house costs.

Husband testified that he attempted to obtain an appraisal of the property in Iran but that it was a difficult process involving the judiciary, and when the appraiser went to the property, "they refused to let them in."

On appeal, Husband suggests that the trial court ignored Wife's interest in this asset, but the record does not support his assertion. One of the factors for the trial court to

consider when dividing the marital estate is "[t]he value of the separate property of each party." Tenn. Code Ann. § 36-4-121(c)(6). Likewise, when considering an award of alimony, the trial court is to consider "[t]he separate assets of each party, both real and personal, tangible and intangible[.]" Tenn. Code Ann. § 36-5-121(i)(7). Here, the trial court's final decree stated:

> The Wife owns an interest in certain real estate located at No. 2 Ba Honar in Mashhad, Iran which was gifted to her by her mother. Neither party has expressed an opinion as to the value of this property nor has any appraisal on this property been provided to the Court. Without competent evidence, the Court cannot determine the value of the property but does find that the Wife's interest constitutes her separate property. . . .
> . . .
> Although the Wife has a 33.3% interest in real estate in Iran, she cannot transfer money outside that country due to the current political climate. The value of this real estate is unknown. The Court finds that other than this property and her share of the marital estate, the Wife has no other assets and no separate estate. . . .

Thus, the trial court clearly considered that Wife has a one-third interest in her mother's home in Iran as her separate property.[13] It simply failed to place a value on it because it found a lack of competent evidence on that issue.

Looking at Husband's asset and debt statement and proposed equitable division, which he submitted as an exhibit at trial, he did not place any value on the Mashhad home either, or Wife's interest in it. His proposal simply stated:

**WIFE'S SEPARATE PROPERTY**

| Description | Wife Value | Husband Value | Court Value | To Wife | To Husband |
|---|---|---|---|---|---|
| **Real Estate** | | | | | |
| 28 No. 2 Ba Honar Mashhad, Iran<br>  1/3 Ownership Interest<br>  FMV<br>  No Debt | _____ | _____ | _____ | X | |

---

[13] In his reply brief, Husband suggests that the trial court "made a finding that this property both was and was not her separate property, contradicting itself." He argues that the trial court "erred with its contradictory finding that it is both separate property and not separate property." Having carefully reviewed the pages cited by Husband and the entire order, we find no support for this statement. The trial court consistently referred to the interest as Wife's separate property.

- 30 -

Thus, the trial court took the same approach that Husband proposed in his exhibit. Having suggested the very action about which he now complains, Husband is not entitled to relief on appeal. *See* Tenn. R. App. P. 36(a).

### 2. Husband's inheritance

Husband also argues that the trial court erred by "assuming that he will inherit his parent's estate in full at their death." Husband argues that the record does not contain a "will or similar estate document showing that this is true." Husband acknowledges his own trial testimony that his father's interest in MSM will go to a trust at his death for the benefit of Husband's mother, and that "[Husband] would not receive anything from the trust until her death as well." At trial, Husband also acknowledged that he and his father had a buy-sell agreement that governed what would happen in the event of death. Still, he argues, "The evidence preponderated against the trial court's finding that [Husband] has some inheritance he will realize at some point in the future and speculated as to its connection to his economic situation or ability to pay alimony." He argues that "the trial court abused its discretion in considering this finding as part of the property division and alimony analyses, requiring reversal."

We find no reversible error in the trial court's consideration of this issue. The final decree stated:

> The Husband has skills as a salesman and the manager of the family business which continues to be successful and has generated excellent income in the past. He is an only child, and both of his parents are advanced in years. The Husband will certainly inherit his parents' estate which includes the other one-half interest in the business. It is anticipated that the Husband will continue to run the business and enjoy a substantial income. . . .
>
> . . . .
> The Husband will leave the marriage with a significant debt load. However, he owns a 50% interest in an on-going business concern that clearly generates significant income. Further, he is an only child, and both of his parents are of advanced years. As result, the Husband exercises almost total control of the business and will almost certainly inherit the other 50% of the business upon the death of his parents.

Husband conceded at trial that he is the beneficiary of the trust at his mother's death. His deposition testimony was also submitted at trial, in which he was asked, "Have you talked with your father about at his death you would continue to take care of your mother and then receive the assets?" Husband replied, "That's understood."

The trial court has broad discretion to consider equitable factors that it deems appropriate when dividing the marital property and awarding alimony. *See* Tenn. Code Ann. § 36-4-121(c)(12) (directing the court to consider "[s]uch other factors as are necessary to consider the equities between the parties"); Tenn. Code Ann. § 36-5-121(i)(12) (requiring consideration of "[s]uch other factors . . . as are necessary to consider the equities between the parties"). Clearly, this would include the fact that Husband is likely to become the sole owner of MSM at the death of his parents, who are already of advanced age. The trial court did not err in its consideration of this issue.

## E. Reversal of Property Division

Husband's next issue was premised on this Court's reversal of the trial court's marital property division based on the issues raised above. In the event that we ruled in his favor on the first issues and reversed the property division, Husband argued that reversal of the alimony award must necessarily follow. Because we found no basis for reversing the division of marital property, this issue is pretermitted.

## F. Calculation of Alimony

We now turn to the issue of alimony. Husband argues that the trial court's alimony ruling was "clearly unreasonable" because he does not have the ability to pay the amount awarded by the trial court.

In Tennessee, trial courts are afforded "wide discretion in determining matters of spousal support." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A spousal support decision "is factually driven and involves the careful balancing of many factors." *Id*. As such, "trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Id.* When reviewing a spousal support award on appeal, our role "'is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable.'" *Id*. (quoting *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006)). We are "'generally disinclined to second-guess a trial judge's spousal support decision.'" *Id.* (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Our standard of review "does not permit an appellate court to substitute its judgment for that of the trial court" and recognizes that "'the decision being reviewed involved a choice among several acceptable alternatives.'" *Id.* (quoting *Henderson v. SAIA, Inc.,* 318 S.W.3d 328, 335 (Tenn. 2010)). When reviewing an alimony award, we "presume that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.* at 105-06.

The trial court devoted ten pages of the final order to its analysis of spousal support. It specifically analyzed each of the statutory factors for consideration. The court noted that this was a long-term marriage of thirty years and that Husband was 59 years old while Wife was approximately 55. The court found Husband "healthy and energetic" while Wife had

been treated for cancer and some other issues but did not have any significant disability or illness. The trial court found that the parties had established a "very high" standard of living during the marriage, living in a large home that was expensively furnished and driving luxury vehicles. It found that neither the parties nor their children "wanted for anything" over the last fifteen years of the marriage.

The trial court acknowledged that Wife was awarded a disproportionate share of the marital estate but noted that none of the assets awarded to her would produce any significant income. The court anticipated that Wife would in all probability have to use a portion of the assets to purchase a new residence. The trial court acknowledged that Husband would leave the marriage with a significant debt load but pointed out that he would own one-half of an ongoing business that was clearly generating significant income. It also noted that Husband retained a portion of his interest in MSM and a portion of the commercial property in Smyrna as separate property. Also, as previously noted, the court considered the fact that Husband would almost certainly inherit his father's one-half interest upon the death of his parents, who were already of advanced age.

The trial court found a "great disparity in the earning capability of the parties," considering that Wife had "almost no work experience" while Husband had "decades of sales and business management skills." It found that Wife primarily worked as a mother and homemaker during the marriage. It found that she would not be able to rehabilitate herself to earn a salary remotely equivalent to Husband's. The trial court found that Wife's age and limited reading skills would make it difficult for her to compete in the job market. However, the court concluded that "[i]f given an opportunity in the right job," she could earn between $17,000 and $19,000 per year, or $1,336 per month after taxes. Wife's income and expense statement listed zero income and $13,934 in monthly expenses. The trial court carefully reviewed Wife's expenses and reduced or eliminated many, leaving $9,644 in monthly expenses that the court deemed reasonable. Subtracting her potential income from that figure, the trial court found that Wife needed alimony of $8,308 per month.

The court noted that Husband was awarded the parties' business interests and that he "has substantial cash flow." It found that Husband's "average pre-tax, pre-interest cash flow" was $536,056 between 2015 and 2017, and in 2018, his tax return reflected income of $396,200. It also noted that Husband's actual reported "wages" were only $206,615. Husband's post-divorce income and expense statement stated that he received $46,000 per month in "net income" from MSM, which Husband explained consisted of his salary and rental income.

Husband's post-divorce income and expense statement listed $54,950 in monthly expenses. Thus, he claimed a monthly deficit of negative $8,950. The trial court also reviewed Husband's expenses and found some of them excessive and unnecessary, such as his Porsche payment and $3,288 monthly apartment rent. The trial court then referenced

- 33 -

Husband's "list of his other monthly expenses . . . of approximately $33,888." That was the total listed on Husband's monthly expense statement at the time of the pendente lite hearing in 2017. The 2017 expense list was also submitted as an exhibit at trial during Wife's testimony and discussed with regard to Husband's level of spending, especially on the children. In its alimony analysis, the trial court noted that this list contained "duplications of expenses," which the court subtracted. It then concluded, "This leaves monthly expenses of $24,556 in addition to those listed above for a total of approximately $80,324 per month."

The trial court found that "despite the significant debt with which the Husband leaves the marriage, the Court finds he has the ability to pay spousal support." It ordered Husband to pay alimony in futuro of $8,308 per month beginning after the sale of the marital residence. Pending the sale, Husband would continue to comply with the pendente lite support order already in place.

On appeal, Husband argues that the trial court "did not make a finding as to [Husband's] reasonable monthly expenses from which to calculate his ability to pay alimony." From our review of the trial court's lengthy analysis, the trial court did make a finding as to Husband's expenses. After reviewing both of Husband's income and expense statements and concluding that numerous expenses should be removed, it stated, "This leaves monthly expenses of $24,556 in addition to those listed above for a total of approximately $80,324 per month." Thus, it appears that the trial court erroneously *combined* Husband's expenses from both income and expense statements to reach its total. Husband's own "Post-Divorce Income & Expense Statement" lists only $54,950 in expenses.

We deem it appropriate to look only to the expenses listed on Husband's updated post-divorce income and expense statement. On that statement, Husband listed $54,950 in monthly expenses, but this sum included his payment of the mortgage and related bills for the marital home. Because Husband's alimony in futuro obligation will not begin until the marital home sells, those expenses should be deducted from his post-divorce expense total for purposes of determining his ability to pay alimony in futuro. According to Husband's brief on appeal, the mortgage, utilities, and insurance on the marital home total $11,403.58 per month. Subtracting this sum from Husband's expense list, we reach a monthly total of $43,546.42. Husband's post-divorce expense list also included the following additional payments attributable to the marital residence: $537 for the HELOC payment; $140 for the Homeowners Association; and $1,285 for property taxes. Subtracting these expenses that will not be necessary once the marital home is sold, we reach a monthly total of $41,584.42. Husband also included a full car payment of $1,928 for his Porsche, when his corporate vice president of finance testified that Husband only pays ten percent of the payment from his shareholder loan while the business pays ninety percent. As such, we reduce Husband's monthly vehicle payment to $192.80. This reduces Husband's monthly expense by another

$1,735.20, to $39,849.22 in total monthly expenses.[14]

Again, Husband's own income and expense statement listed $46,000 in monthly *net* income from salary and rental income alone. This did not include the substantial amount of shareholder loans that Husband receives each month. Husband withdrew $614,985.70 in shareholder loans in 2016; $449,420.17 in 2017; and around $383,000 in 2018. Both of the experts at trial (and also Husband) agreed that the parties were able to live their extravagant lifestyle because of the shareholder loans. Wife's expert explained that Husband's reported salary simply did not align with his claimed expenses of over $50,000 per month or the assets he had accumulated. He said Husband required distributions from the company to maintain that level of spending. Husband's expert likewise testified that Husband had been able to meet his obligations exceeding his cash flow because of the shareholder loans from the company. Husband also acknowledged that in order to live in a $2.5 million home and maintain the family's standard of living, he was borrowing from the company to pay for it all. Husband now insists that he was simply living beyond his means. Although that may be true to some extent, we think the evidence shows that Husband does have the means to maintain his extravagant lifestyle. There is nothing in the record to suggest that Husband will not continue to have access to shareholder loans, and we agree with the trial court's conclusion that it is highly unlikely that Husband will ever repay the obligation. As the trial court noted in its alimony analysis, "Husband is in total control of the income."

In the *Echols* case discussed above, in which the husband had a similar "suspect" debt obligation to his corporation, this Court found it appropriate to consider his "average advances from the Corporation of over $140,000 annually" when reviewing the award of alimony.[15] 2000 WL 688589, at *7. The alimony statute broadly permits the consideration of each party's "financial resources" in addition to any other factor affecting the equities between the parties. Tenn. Code Ann. § 36-5-121(i)(1), (12). Considering Husband's monthly net income of $46,000, his additional access to shareholder loans, and his monthly expenses, the record supports the trial court's conclusion that he has the ability to pay alimony in futuro of $8,308 per month.

Husband also "requests a credit for the amounts paid pursuant to the Pendente Lite order that exceed his ability to pay." Again, however, he cites no authority for his argument that he is entitled to such a credit and does not point to anywhere in the voluminous trial

---

[14] We recognize that Husband will also have an annual payment to Wife for the judgment to equalize the division of marital property.

[15] This situation is distinguishable from *Goodman v. Goodman*, 8 S.W.3d 289, 292 (Tenn. Ct. App. 1999), in which the husband was borrowing "from a trust in which his mother [was] the beneficiary." He had to pay back the loans with interest, and his mother could end the loans at any time. *Id.* at 294. Considering these facts, we held that such loans should not have been considered as income to the husband for purposes of setting alimony. *Id.* at 295.

record where he requested such a credit before the trial court.[16]  Husband is not entitled to the requested relief on appeal.

### G.    Attorney's Fees

Finally, we address Wife's issues regarding attorney's fees.  Wife argues that the trial court erred by failing to order Husband to be responsible for a larger portion of her attorney's fees and expert witness fees.  Wife notes that she raised this issue in her motion to alter or amend.

In the final decree of divorce, the trial court found that Wife claimed $70,769 was owed to her attorney and that $29,707 was owed to her expert witness.  It found that Husband owed his attorney $108,940.  In analyzing Wife's request for Husband to pay her attorney's fees, the trial court noted its observation during the proceedings that Husband experienced difficulties securing information regarding Wife's ownership interest in assets both inside the United States and abroad.  The trial court found that "Wife pled ignorance" when asked about her assets, which necessitated the taking of depositions of her family members outside the State of Tennessee.  It noted that Husband's efforts led to the discovery of Wife's one-third interest in the home in Iran and the possibility of an interest in assets belonging to her parents in Denver.  The trial court recognized that Wife's interest in the property in Iran was difficult for her to access and utilize but said "the ownership interest exists nonetheless."  The court found that Wife either intentionally attempted to hide her interest or, more likely, failed to exercise due diligence to determine whether an ownership interest existed.  In either event, the court reasoned, Husband was "compelled to expend unnecessary resources in an effort to secure information" that should have been forthcoming from Wife.  The court found that this resulted in both parties expending additional and unnecessary attorney's fees, for which Husband should not be responsible.  As a result, the court explained that it was reducing Wife's attorney's fee award due to the unnecessary fees incurred by both parties.  Husband was ordered to pay Wife's outstanding expert witness fee of $29,707 in addition to $40,000 toward her outstanding attorney's fee.  The trial court noted that Husband had already paid an additional portion of Wife's attorney's fees during the divorce proceeding without being ordered to do so.[17]

Thereafter, Wife filed a motion to alter or amend, asking the court to "reexamine" the issue of attorney's fees.  She conceded that her exhibits at trial only reflected the

---

[16] This Court rejected a similar argument in *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *10 (Tenn. Ct. App. July 28, 2009) ("Husband also sought a credit for the $12,000 in alimony pendente lite paid during the six months before the final judgment was entered . . . . Husband cites no authority justifying his request for a credit against the final alimony award and we find no basis for granting his request.").

[17] The trial exhibit reflecting Wife's itemization of attorney's fees showed $167,307.77 billed through December 31, 2018, with payments of $96,537.97 and an outstanding balance of $70,769.80.

amounts she owed "up to the date the trial commenced."[18]  After adding the amounts incurred for the original four-day trial in addition to the additional hearing for reopening the proof, Wife claimed that she currently owed $124,851.69 for attorney's fees and $55,378.05 for expert fees.  She asked the court to "consider these total amounts" and "make any changes" to the final decree of divorce that the court deemed necessary.  Husband filed a response, asserting that the parties had already completed a five-day trial, the trial court had thoroughly considered all the issues in a 47-page order, and Wife offered no explanation as to why it was necessary to relitigate the issue of attorney's fees.  After a hearing, the trial court entered an order denying the motion to alter or amend, stating that Wife's request for the court to consider her trial and post-trial attorney's fees and to reallocate the award was denied.

We will review the trial court's two orders on this matter separately, beginning with the ruling in the final decree of divorce.  An award of attorney's fees is appropriate in a divorce proceeding "'when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, or the spouse would be required to deplete his or her own resources to pay them.'"  *Olinger v. Olinger*, 585 S.W.3d 919, 922 (Tenn. Ct. App. 2019) (quoting *Gonsewski*, 350 S.W.3d at 113).  Whether to award such fees is in the sound discretion of the trial court.  *Id.*  "While there are no strict parameters for the exercise of such discretion, an award of attorney's fees should generally be 'just and equitable under the facts of the case.'"  *Cooley v. Cooley*, 543 S.W.3d 674, 687 (Tenn. Ct. App. 2016) (quoting *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992)).

Given the trial court's reasoned explanation for its decision to award Wife only a portion of her outstanding attorney's fees, we cannot say that the trial court abused its discretion.  "We have no qualms with the trial court's refusal to sanction an award for fees that it determined were unnecessarily incurred."  *Erdman v. Erdman*, No. M2018-01668-COA-R3-CV, 2019 WL 6716305, at *6 (Tenn. Ct. App. Dec. 10, 2019).

We now turn to the denial of Wife's motion to alter or amend.

As a general matter, there are four basic grounds upon which a motion to alter or amend may be granted.  First, the moving party may demonstrate that it is necessary to correct manifest errors of law or fact upon which the judgment is based.  Second, the motion may be granted to permit the moving party to present newly discovered or previously unavailable evidence.  Third, the motion may be justified by an intervening change in the controlling law.  Fourth, the motion may be granted when necessary to prevent a manifest injustice.

_____

[18] Wife's trial brief stated, "Wife estimates her unpaid attorney fees and costs will be between $60,000 to $80,000 as accumulated during this case and for the trial."

*Bough v. Tenn. Dep't of Corr.*, No. E2017-02350-COA-R3-CV, 2018 WL 4181877, at *3 (Tenn. Ct. App. Aug. 30, 2018) *perm. app. denied* (Tenn. Jan. 17, 2019) (quoting *Hughes v. Tenn. Bd. of Parole*, No. W2005-00838-COA-R3-CV, 2005 WL 3479632, at *4 (Tenn. Ct. App. Dec. 20, 2005)).

Essentially, Wife asked the court to consider evidence not presented at the original trial.

> When a party files a Rule 59 motion seeking to alter or amend a judgment and attempts to present additional evidence in support of such a motion, the trial court should consider: the moving party's effort to obtain the additional evidence that the moving party seeks to present; the moving party's explanation for failing to offer the evidence earlier in the proceedings; the importance of the new evidence to the moving party's case; the unfair prejudice to the non-moving party; and any other relevant consideration.

*Sellers v. Walker*, No. E2014-00717-COA-R3-CV, 2015 WL 1934489, at *7 (Tenn. Ct. App. Apr. 29, 2015) (quoting *Legens v. Lecornu,* No. W2013-01800-COA-R3-CV, 2014 WL 2922358 at *14-15 (Tenn. Ct. App. June 26, 2014)). "In order to sustain a motion to alter or amend under Rule 59.04 based on newly discovered evidence, 'it must be shown that the new evidence was not known to the moving party prior to or during trial and that it could not have been known to him through exercise of reasonable diligence.'" *Kirk v. Kirk*, 447 S.W.3d 861, 869 (Tenn. Ct. App. 2013) (quoting *Seay v. City of Knoxville,* 654 S.W.2d 397, 399 (Tenn. Ct. App. 1983)). When the litigants have already had a trial and one party seeks to present new evidence by a motion to alter or amend, courts should be cautious in altering the judgment. *Legens*, 2014 WL 2922358, at *15. "Rule 59.04 motions are not opportunities to re-litigate the issues previously adjudicated at trial." *Burris v. Burris*, 512 S.W.3d 239, 247 (Tenn. Ct. App. 2016).

"A trial court's decision on a motion to alter or amend is reviewed under an abuse of discretion standard; this standard of review does not permit the appellate court to substitute its judgment for that of the trial court." *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 298 (Tenn. 2020). Here, the trial court's order states that the trial court denied Wife's request for the court to consider her additional attorney's fees after hearing argument of counsel "and testimony of the parties." We have no transcript of the hearing and no basis for concluding that the trial court abused its discretion in denying the motion to alter or amend.

Finally, Wife requests an award of her attorney's fees on appeal. She cites no statutory or contractual authority for her request but appeals to the discretion of this Court. We respectfully deny Wife's request for attorney's fees on appeal. *See In re Mattie L.*, No. W2018-02287-COA-R3-PT, 2020 WL 1867372, at *8 (Tenn. Ct. App. Apr. 14, 2020)

*perm. app. granted* (Tenn. Aug. 11, 2020)[19] ("We decline to award attorney's fees to a party that cannot identify a contractual, statutory, or some other basis for such an award.")

## IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court and remand for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the appellant, Reza Aliabadi, and to the appellee, Sima Khayatt Kholghi, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

[19] The application for permission to appeal filed in *In re Mattie L.* addressed other grounds and did not raise any issue regarding the opposing party's request for attorney's fees on appeal.